

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| O.L., | § | |
| | § | No. 08-14-00184-CV |
| Appellant, | | |
| | § | Appeal from |
| v. | | |
| | § | 65th District Court |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 2012DCM09529) |
| | § | |

## **O P I N I O N**

This appeal arises from the termination of Appellant's parental rights. Litigation began when three children were removed from their mother. For privacy purposes, we shall refer to her as Mother. The three children were born to different fathers. Mother also has an older child who resides with her father. During the course of these proceedings, Mother executed an affidavit voluntary relinquishment on May 2, 2014 and her rights to all three children were terminated. The fathers of the three children at issue then became the focus of the Department as they attempted family reunification. Daughter RD's alleged father could not be located and the Department was ultimately named as her managing conservator. Son MDF was placed with his father. Only the parent-child relationship between OL and his son SD are at issue here.

## FACTUAL SUMMARY

SD was born on August 30, 2006. OL and Mother were not married but OL attended the birth and signed the birth certificate. On February 23, 2012, the Department received a report of neglectful supervision of SD and MDF by Mother. The report stated that SD was erratically absent from school, that Mother slept all day, and that SD complained of being hungry. The child mentioned that his sister RD cared for him. There was a concern about the level and frequency of Mother's intoxication, especially while providing care for the children. SD was placed in the Child Crisis Center on February 24 and he remained there until April 4 at which point he moved with Mother to Aliviane for Family Based Safety Services. She was provided with assistance to prevent removal of the children but she continued to drink after completing inpatient treatment and did not consistently participate in outpatient treatment.[1]

On October 24, the Department filed its original petition seeking termination of OL's parental rights because he (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered SD's physical or emotional well-being, and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered SD's physical or emotional well-being. It sought temporary sole managing conservatorship with a goal of family reunification. Alternatively it sought termination.

The children were taken into possession of the Department on December 14, 2012 and the first amended petition was filed the same day. A full adversary hearing was conducted on December 28, 2012 and February 4, 2013. The trial court entered an order of removal pursuant to Section 262.104 and the Department was named temporary sole managing conservator. As of

---

[1]  Mother's family history is one of tragedy. Her father, the former president of Liberia, was publicly executed, triggering Mother's cycle of addiction.

February 8, 2013, the permanency goal was family reunification with a target date of November 30, 2013.

In the meantime, efforts began to locate OL. The Department conducted a diligent search of the paternity registry and found no notice of intent to claim paternity. Information suggested that he was living in Georgia, but he was finally located in Pennsylvania. A service plan was created on March 5. On March 6, OL formally admitted paternity. On March 8, the service plan was presented to the court and an order was entered by which OL was required to (1) fully cooperate with the Interstate Compact on Placement of Children (ICPC) process; (2) maintain a minimum of weekly contact with the caseworker for the Department; (3) provide the Department with any changes in his phone number, address, and/or employment; (4) maintain an appropriate and cooperative attitude with the caseworker and the Department, including telephone contact, face to face contact, home visits, parent/child visits, court proceedings, and any other communication or interaction; (5) refrain from using abusive language during said contact; (6) maintain safe and stable housing; (7) provide proof of sustainable income, including copies of Medicaid, food stamps, Social Security benefits, family support, pay stubs from current employers and/or employment verification; (8) provide the Department with a monthly family budget to show how the family would meet the child's needs; and (9) send letters to his son at least once a month. On March 14, the court entered an order adjudicating parentage. A few days later, OL filed a motion asking that SD be placed with him, or in the alternative, that he be provided with a telephone number so he could speak with his son.

OL's service plan was evaluated as of May 20, 2013. He had not followed through with the ICPC request and the Department had no point of reference to determine caregiver capability

3

or quality of care he could provide to child, and no home study to determine living conditions or home stability. OL was described as very argumentative, verbally aggressive, and oppositional with the caseworker during telephone contact. He had also been inconsistent with telephone contact with his son.

A serious incident report was filed on June 17, 2013. The Department received the ICPC from Pennsylvania with a denial of placement of SD with his father. The following Social Work Assessment was provided to the Department by Pennsylvania:

> Although [OL] reports being invested in caring for his child, his criminal charges are of grave concern to this agency. [OL] never received therapeutic interventions to address his charges of molestation and enticing a child for indecent purposes. Therefore, this agency cannot support the return of SD to the care of his father.

Another Permanency Plan and Progress Report dated June 21, 2013 noted that SD was currently placed at the Child Crisis center until fictive kin returned from out of state. He had adjusted well to his placement and had weekly sibling visits and visits with his mother. At this point, the primary permanency goal was unrelated adoption because there were no relatives able or willing to care for the child. The concurrent goal was family reunification if Mother could demonstrate rehabilitation, stability, and the ability to provide a safe environment and provide for the child's needs.

Another serious incident report was filed on August 15, 2013. The caseworker had a telephone conversation with OL the previous day. He became verbally aggressive, yelled, and did not allow the worker to speak. It noted that conversations with OL had become challenging because of his anger issues:

> I was explaining to him that since there is no updated information regarding his criminal history and he said he was going to get it for me, I said I had to work with what I had as of today. I told [OL] that I wanted him to do some research in finding a therapist that can provide therapy to him, since it was a recommendation from ICPC. [OL] was not happy and refused to do any therapy. That's when he became very agitated, irate, angry, shouts and verbally aggressive. This kind of outrage occurs

4

> every time we have a phone conversation, he explodes. There have been 1-2 occasions when I hung up on him, due to his verbal aggression.

The Family Service Plan Evaluation of September 24, 2013 recounted that the Department had no point of reference to determine if OL lacked knowledge in child development. He lacked impulse control and had a criminal history that was discovered through the ICPC request with charges of child molestation and enticing a child for indecent purposes. He was unsupported by extended family, was unrealistic about change, refused to cooperate with the Department, and was verbally aggressive. Moreover, he had been inconsistent in telephone contact with child. The Department demanded that OL actively participate and complete individual therapy with a service provider in his area. Sessions were to address how to understand decisions and activities that have affected the child, CPS involvement, the course of the legal case, psychological evaluation recommendations, how to deal with conflict resolution positively, positive support systems during difficult situations, and any other issues that might arise. He was to continue until the therapist conveyed to the caseworker that all therapeutic goals had been reached and there were no further concerns for the ability to effectively parent. OL was directed to provide the Department with the name, address, phone number, and date of appointments to the caseworker via mail or email. Requirements from previous plans were continued.

By October 30, the court entered orders finding that OL had not demonstrated adequate and appropriate compliance with the service plan and that neither the child's parents nor any other person or entity entitled to service under Chapter 102 of the Texas Family Code was willing and able to provide SD with a safe environment. The court further found that return of the child to a parent or other person or entity was not in the child's best interest; the child continued to need substitute care and his current placement was appropriate for his needs. An update report

December 18, 2013 indicated that the Department did an emergency placement in a foster home in Houston and the child would be placed on December 21. In an updated report of March 31, 2014, the Department noted RD and SD would be placed with maternal relatives in Alaska on April 17, 2014. Chronologically, then, the following outlines SD's placements:

| | |
|---|---|
| Child Crisis Center | 12/14/12 to 3/13/13 |
| Foster home | 3/13/13/ to 3/28/13 |
| Fictive kin | 3/28/13 to 6/11/13 |
| Shelter | 6/11/13 to 6/27/13 |
| Fictive kin | 6/27/13 -12/21/13 |
| Foster home in Houston | 12/21/13-4/17/14 |
| Relatives in Alaska | 4/17/14 - trial |

On May 8, 2014, the Deparatment filed a second amended petition seeking termination on the following statutory bases:

> voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months, pursuant to § 161.001(1)(C), Texas Family Code;

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(1)(D), Texas Family Code;

> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(1)(E), Texas Family Code;

> failed to support the child in accordance with the father's ability during a period of one year ending within six months of the date of the filing of the petition, pursuant to § 161.001(1)(F), Texas Family Code;

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to the father; (2) the father has not regularly visited or maintained significant contact with the child; and (3) the father has demonstrated an inability to provide the child with a safe environment, pursuant to § 161.001(1)(N), Texas Family Code;

6

failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to § 161.001(1)(O), Texas Family Code.

A divided jury answered "Yes" to all statutory bases alleged.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2014). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003) (noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (in discussing the constitutional

stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex.2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### *Burden of Proof*

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20-21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.-Corpus Christi 2006, no pet.) (recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003) (noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to

be established." TEX.FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.,* No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied) (op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

### Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses

9

one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

### *Statutory Predicates*

The termination order here was based on TEX.FAM.CODE ANN**.** § 161.001 (C)(D)(E)(F) (N) and (O), with the jury finding that OL had:

voluntarily left the child alone or in the possession of another without providing    adequate support of the child and remained away for a period of at least six months;

knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

failed to support the child in accordance with the father's ability during a period of one year ending within six months of the date of the filing of the petition;

constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to the father; (2) the father has not regularly visited or maintained significant contact with the child; and (3) the father has demonstrated an inability to provide the child with a safe environment; and

failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Best Interest of the Children*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976) ("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

## THE WITNESSES

Priscilla Flores had worked for the Department in Family Based Safety Services for four and a half years. This case was assigned to her in April 2012 on the basis of neglectful supervision by Mother. All three children were living with their mother at Aliviane Residential, a rehabilitation facility where a parent and children can stay for three or four months during treatment for alcohol or substance abuse. Mother sought alcohol treatment voluntarily and completed her treatment in January or February of 2012.

11

There were two additional intakes after Mother completed Aliviane. In October 2012, the Department received reports that Mother was drinking and allegations of sexual abuse of RD. The children were placed at the Child Crisis Center and the Department sought custody. Flores had a conversation with OL to tell him where SD was and that she needed to contact Child Protective Services in Georgia for a background check and home study. He did not provide needed information at first. He explained that he was going to Africa for his mother's funeral and that he would call back with a post office box number. He never did so. At some point, OL moved to Pennsylvania. He did not explain why he moved or with whom he was living. Flores continued as the caseworker until February 2013. She saw RD and SD on a regular basis – at least once a month.

Mirna Calzada worked as a Child Protective Services specialist known as a conservatorship worker. She became involved with SD in mid-February 2013. She testified that while she worked the case, OL sent no money, no clothing, and no toys for SD. Calzada prepared three family plans of service and sent them to OL in Pennsylvania. The first was created on February 12, 2013. OL never signed it and claimed he never received it. In terms of compliance, he only offered proof of Social Security income. When asked about his failure to comply, she replied, "[OL] would report to me that he didn't have to do anything", even though it was ordered by the court.

The second plan of service was dated May 20, 2013. It was mailed to OL but he did not sign or return it. His directions and tasks remained the same. He did complete the first ICPC request but provided no proof of any other steps he had taken. When Calzada spoke with him, OL offered the same excuse - he didn't have to do anything.

The third plan was created on September 24, 2013. This plan repeated earlier requirements and included additional tasks.

> In this current service plan, [OL] was asked to do the following: Actively participate and complete individual therapy with a service provider in the area. Sessions will address how to understand decisions and activities that have affected the child, CPS involvement, the course of the legal case, psychological evaluation recommendations, how to deal with conflict resolution positively, positive support systems during difficult situations and any other issues that might arise. [OL] will continue with therapy until the therapist conveys to the worker that all therapeutic goals have been reached and there are no further concerns for the ability to effectively parent. [OL] will provide the Department with the name, address, phone number and dates of appointments to the caseworker via mail or email.

> Second task, [OL] will actively participate and complete parenting classes with a service provider in the area. [OL] will provide the Department with the name, address, phone number and date of appointments to the caseworker via mail or email.

> Third task, [OL] will actively participate and complete a psychological evaluation with a service provider in the area. [OL] will follow any and all recommendations made by the provider. [OL] will provide the Department with a name, address, phone number and date of appointments to the caseworker via mail or email.

> Following task, [OL] will actively participate and complete anger management classes with service provider in the area. [OL] will follow any and all recommendations made by the provider. [OL] will provide the Department with name, address, phone number and date of appointments to the caseworker via mail or email.

Concerning the ICPC, there were two separate requests made to the State of Pennsylvania. Calzada explained that when the State of Texas, or any state, takes custody of a child, there is a policy in which each state works with the other in order to place a child from one state in a different state. The Department is not allowed to place a child in a different state without the permission of the receiving state. It submits a request and the receiving state then processes it. The receiving state will contact a particular person under consideration for placement. Interviews are conducted. Criminal background checks are performed. They evaluate the home to determine

13

whether or not that caregiver is an appropriate caregiver to receive the child and for the child to be placed in that state.

The first ICPC request occurred in February 2013. Following an investigation into OL, the State of Pennsylvania denied the request that SD be placed with his father. A home study was performed. An issue then arose concerning OL's criminal history. The investigation revealed one conviction of minor battery and charges of an aggravated felony, enticing a child for indecent purposes, and child molestation. The incident arose when Mother, OL and the children were living in Georgia. Mother's sister was staying with the family and sleeping in the same bedroom as RD and SD. According to OL, he had gone into the bedroom to tell the sister to turn out the light and hang up the phone. A while later, he noticed the light was still on and he returned to the bedroom. To get her attention, he touched the 16-year-old on the leg. According to the Department's attorney, the official records demonstrated that he pled guilty to child molestation in August 1998 and it was reduced to a lesser included offense of enticing a child, which was Count One. OL requested to be treated under the First Offender Act. He was sentenced to five years of deferred adjudication or pretrial diversion. He went back to court, in March 2000, and entered a plea to a lesser included offense of simple battery and was sentenced to 11 months and 29 days. The attorney then told the court:

> We've all done immigration. We all know that was done to avoid deportation. I'm sure that's what that was to get that lower sentence. But, in that plea, it said right in here, he's to continue sex offender treatment. He's to have no contact with the victim. And it notes that he should report to his probation officer after being released from INS. It's all in there. Everything he's complaining about, it's in there. We're not misstating anyone [sic]. It's all in there. . . . And I think Pennsylvania, this worker that prepared this report, had a right to be concerned about it because he pled guilty to it in the beginning.

Apparently out of an abundance of caution, the trial court ordered that a second IPIC be performed. This time, placement with OL was rejected because OL failed to cooperate. The worker in Pennsylvania made several attempts to contact OL to schedule a home visit and set up interviews, but OL did not return phone calls and failed to schedule appointments. The worker concluded that OL was evading them. Finally, the Department had the same concern in reference to OL's criminal background.

Calzada then explained why additional requirements were added to the third service plan.

Q: And what was in there that caused you to feel you needed to add the therapy, the conflict resolution, the parenting and the other services you identified?

A: The recommendation made by the State of Pennsylvania was [OL] never received therapeutic interventions in reference to some criminal charges that were found during the process of doing some FBI background checks on [OL].

Q: So you added that as something for him to complete?

A: Yes.

Q: What was the request for conflict resolution based on?

A: [OL], throughout our conversations, they were very intense in nature because he was -- most of those conversations he was very angry. He was upset. He would be irate, verbally aggressive. There were times where I had to hang up the phone because of the way he was speaking to me.

Q: Give us an example?

A: He would be yelling at me as I was trying to explain the process that Child Protective Services had to go through in reference to this home study, the placement of his child, different situations that were occurring in the case. He would not allow me to speak. He would be very angry.

Q: Did you outline that in a serious incident report?

A: Yes, sir.

Q: Now, when he started yelling at you on the phone, did you take any corrective action in how you interacted with [OL]?

A: Yes. There were several conversations that that was the nature of the tone of our conversations. So different times, I tried to get him to calm down, you know, to be more appropriate in our conversation. Eventually, it got to the point where I had notified the Court and I had notified my attorney in reference to this interaction to the point that we got to where [OL] had to go through his attorney to provide any type of documents, notifications. Our interaction was going to be the attorneys.

Calzada then outlined the ways in which OL had failed to comply with his service plan. He violated the order to refrain from using abusive language during contact with the caseworker. He never proved that he could provide sustainable income. He failed to demonstrate that he could maintain safe and stable housing. Perhaps most importantly, he did not fully cooperate with the ICPC process. He had made no attempt to come to El Paso to visit his son, nor had he personally attended any of the court hearings, although he participated by telephone. He had only mailed one letter to his son, although he was required to send something monthly. His telephone contact with SD was inconsistent and of short duration.

Finally, Calzada described the plans for permanency. By the time of trial, SD and RD had been placed with their aunt and uncle in Alaska. An ICPC study was performed in Alaska and placement was approved. The relatives want to adopt. Calzada then spoke of the relationship between the siblings.

Q: Can you describe for the jury the relationship between [RD] and [SD]?

A: With my work and experience throughout the case, [RD] and [SD] have a very close relationship. Samuel has always looked to [RD] as a mother figure. She's the one that has been responsible in watching out for him and taking care of him. They have a typical sibling relationship, there are ups and downs, and sibling fights, but during the process, he always looked to her. He looked to her for that guidance, that support, that reassurance. Even when I took them both to Alaska, he would kind of stay close to her and kind of seek her approval for certain things, especially when we arrived to the home and exploring the home and looking at his

surroundings. They've been with these relatives together, so they've never been separated aside from a couple of placements during the case.

Q: Do you feel they should remain together as a sibling group?

A: Yes, sir.

Q: Do you believe that termination of [OL]'s rights is in the best interest of [SD]?

A: Yes, sir.

Q: Why is that?

A: [SD] has had a significant relationship with his sister. They've been the constant since [SD] was a child. As I stated before, he sees [RD] as a mother figure. She's going to watch out for him, would be responsible for him in the sense that, once they were out of school, she would be the one responsible for picking him up when she got out of school and he got out of school.

Q: And when they went to look at the house the first time, the house wasn't even that bad of shape because [RD] was 10 and she was making sure that [SD] was dressed. She was trying to make sure, as best a 10 year old kid can, that the house was clean and habitable, right?

A: Yes.

* * * *

Q: Do you believe that separating [SD] from [RD] would be detrimental to the mental health and emotional welfare of Samuel?

A: Yes, sir.

Q: So it would be detrimental to separate them?

A: Yes, sir.

Q: And looking at whether it's in the best interest to terminate [OL]'s rights, are you concerned about the issues raised in both the home studies?

A: Yes, sir.

Q: One of the major issues is there's a sex offense, correct?

17

A: Yes, sir.

Q: And any time there's a sex offense, that has to raise a certain number of red flags, correct?

A: Correct.

Q: You've looked at the judgments that were obtained regarding the offense?

A: Yes, sir.

Q: And the courts that were involved in that sex offense ordered that he not have contact with children under the age of 16, correct?

A: Yes, sir.

Calzada also described that [OL] was upset and angry when asked to undergo anger management and he refused to do it. He was uncooperative from the beginning and did nothing that was ordered in the service plans. He was instructed in March 2013 to engage in therapy, to engage in counseling, and to get a psychological evaluation. He did not do so until March of 2014, on the eve of trial.

Tonya McGee testified on behalf of OL. She met him in Georgia in 2008 when he and her husband were working on music together. She saw OL with SD when Mother left SD and RD with him for approximately two months. SD was only one year old. At the time, OL was living in a hotel room but he did everything for the children. McGee moved to Florida in 2009 and she has not seen OL or SD since.

OL testified via telephone. He suffered a back injury working in the warehouse of his employer and receives Social Security disability income. He described his relationship with Mother and the children. He, Mother, RD and SD lived together in 2006 and 2007 in Georgia. They separated in 2009, but he saw the children almost every day. He took RD to school and

18

picked her up. He would take Mother wherever she needed to go, and then he would spend the day taking care of SM. At one point, Mother dropped the children off for approximately two months. Some three or four weeks after she retrieved the children, she moved to North Carolina. He did not visit with them there. She and the children ultimately moved to Texas, but OL did not visit them there, either. And when he moved from Georgia, he moved to Pennsylvania rather than to Texas. OL claimed that he was unaware of the Department's removal of the children until after the third incident.

OL wanted custody of SD, and claimed that they had a strong bond. He would be the best person to raise him because he is his biological father. He was preparing himself to be independent again by entering a program called Past Plan for Education that enabled him to go back to school for retraining for a different field of work. He apologized for not personally attending the trial. His absence was unintentional because he wanted to show the jury the flaw in the system and how he had been unjustly treated concerning his biological child. His back injury makes it difficult for him to sit for long periods and he couldn't ride for two days on a bus. He could not afford the airline ticket.

OL was then asked about the criminal charges in Georgia and he offered his explanation.

A: What happened was, at the time, my wife and I were living together with my kids and her sister. She was about 16 years old -- 16 to 18. And she and my kids slept in the same room. And my wife went to work that night. I was home watching television in my room. And it was after 11:00 almost after 12 when I got up to go to the bathroom and noticed the light on in the kids' room. So I went in there and she was on the phone. And I told her, I said, Look, Michelle, you need to put the phone down. It's late. My kids are sleeping. They have to go to school and you have to be to school. You can't be up on the phone. So you need to cut it off and go to bed. And I told her, I'm going to the bathroom and going to my room. If I come out again and see you on the phone, I will have to call your sister to let her know. So I went in my room. When I came back later on, she was still -- I saw the light on. She was still on the phone. I walked in the room. She had

19

her back turned towards the door sitting on the bed. So I tap her on the leg. I said, Michelle, put the phone down. I told you before, cut it off. The kids are asleep. You need to go to sleep. You need to get up for school in the morning. I took the phone from her and placed it down, cut the light off and went to my room. After a while, the next thing I heard, knocking on my door and police were in my house and pulled me out and they took me in for -- what's the first one they said? Enticing a child. And we went to the -- we went to the judge the next day. The judge dismissed the case. He said there was no case. He didn't see any enticing. I explained to him what happened. I was trying to discipline, not with the intention that they was talking about. So after a year or so, then they came back to me and said they want to go to court, the state was pressing charges, not the girl, but the state was pressing charges. And I went and got a lawyer. My first time going through something like that. Never been through any problem with the law. I've always been a law-abiding person. So it was confusing to me. You know, based on my lawyer's advice he said to take the first offender because I've never done anything before and after five years it would be off my record and I won't have any problem. I said, Are you sure it will be off my record? I don't want something like this on my record. I didn't do anything like that. He said, Yeah, it will be off your record, because a case like this will take a long time and a lot of money. And you don't have money to spend a lot of time on this case. Just take first offender. So based on my lawyer's advice I took the first offenders.

Q: Okay. So how is it that it ended up as a conviction for simple battery?

A: Well, after I took the first offender, they gave me probation. I was on probation. And the immigration got involved. Immigration got involved. They were talking about deportation. I said, Well, if this is the case, if they are going to deport me, I want to go back -- if I'm going to be deported then I should be deported with a clear record. I'm not just going to let myself be carried away with such a record. And then I have kids here. I can't let that be on my kids, so I decided to reopen my case. And I got a lawyer. My lawyer filed the paperwork and we reopened the case. And the judge went through the case, called the defendant for the first time, asked the defendant. The defendant admitted what really did happen. And the judge apologized to me. She and the court. She apologized to me.

As to compliance with his service plan, OL testified that he started therapy on March 4, 2014 and finished on May 27. His therapy was one hour a week for ten weeks. And he claimed that he took all of the classes that were required of him. No certification of completion was offered and the only therapy notes were dated March 4. When questioned, OL explained that the notes could not be incomplete,

20

because I signed a release form at the department there that was sent to records department. And records department sent all the information to my lawyer for the time I was there, all the classes I took. . . . After the evaluation, they told me I only had to go there and see the therapist. And I did exactly what they told me to do.

He did admit that he paid no support while his son was in foster care and although he was instructed to send something to the boy every month, he only did it once.

## ISSUES FOR REVIEW

OL brings eight issues for review. In Issue One, he complains that the trial court struck his counter-petition requesting conservatorship of his son based on its interpretation of the ICPC, thereby violating his constitutional due process rights. Issues Two through Seven challenge the legal and factual sufficiency of the evidence to support the statutory grounds for termination while Issue Eight complains of the sufficiency of the evidence to support the finding that termination is in the child's best interest.

## INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN

Issue One presents three sub-parts. First, OL claims that the trial court erred by striking his counter-petition seeking custody of his child because of the ICPC reports.[2] Second, he contends that the ICPC does not apply to parents such that the trial court's interpretation of the statute was erroneous. Third, he claims that application of the ICPC violated his constitutional rights to due process and equal protection. The crux of his argument is that he was prevented from having a jury decide whether he should have custody of his child, a right guaranteed by both the constitution and the Texas Family Code.

The clerk's record reveals that OL filed the counter-petition and that the Department moved that it be stricken. It does not contain an order striking the pleading, nor does OL offer a

---

[2] The ICPC has been adopted by the State of Texas and is codified at TEX.FAM.CODE ANN. § 162.102 (West 2014).

record reference. Instead, he contends that after a hearing on the motion, the court struck the pleadings. The record does not contain a reporter's record for that hearing. Assuming the trial court did enter such a ruling, OL has not preserved error on the issue. To preserve error, he was required to submit a jury question on whether he should be appointed managing conservator of his son. TEX.R.CIV.P. 287 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party."). Had he done so, and had the court denied it, he could urge this issue on appeal. But not only did he not request the question, he responded that he had "no objections" to the charge as submitted.

With regard to the argument that the ICPC does not apply to parents, OL did not raise this issue in the trial court. Texas Rule of Appellate Procedure 33.1 provides:

(a) *In general*. As a prerequisite to presenting a complaint for appellate review, the record must show that:

(1) The complaint was made to the trial court by a timely request, objection or motion that:

(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

(B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure.

Thus, we cannot address whether the trial court interpreted the statute correctly.

Finally, we turn to the constitutional issues. Two separate ICPC reports were prepared by the State of Pennsylvania, both refusing placement of SD with his father. Trial counsel for OL

22

lodged objections as to hearsay and argued that the information reported was erroneous. He did not raise any constitutional objections. Even constitutional complaints must be preserved in the trial court. *In the Interest of S.A.S. and M.I.S.*, 200 S.W.3d 823, 826 (Tex.App.--Beaumont 2006, pet. denied). While the issue was raised in the motion for new trial, it came too late. We overrule Issue One.

## SUFFICIENCY OF THE EVIDENCE

As we have mentioned, OL challenges the legal and factual sufficiency of the evidence to support each of the statutory predicates for termination found by the jury as well as the finding of best interest. The Department correctly responds that he has failed to preserve error on these issues.

A legal sufficiency challenge to the jury's verdict may be preserved by a motion for directed verdict, judgment *non obstante veredicto,* or to disregard jury findings. TEX.R.CIV.P. 301; *Aero Energy Corp. v. Circle C Drilling Co.,* 699 S.W.2d 821, 822 (Tex. 1985). In the absence of one of these, a motion for new trial must raise the issue. A factual sufficiency point must be preserved in a motion for new trial. TEX.R.CIV.P. 324(b)(2)-(3). OL filed a motion for new trial, but did not raise a single complaint concerning the sufficiency of the evidence. We overrule Issues Two, Three, Four, Five, Six, Seven, and Eight.

We recognize that termination cases present a tension between the precious rights of parenthood and the procedural policies of the judicial system. The Supreme Court has spoken to the delicate balancing required by the courts.

> Important prudential considerations underscore our rules on preservation. Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds. . . . In addition, our preservation rules promote fairness among litigants. A party "should

23

not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time." Moreover, we further the goal of accuracy in judicial decision-making when lower courts have the opportunity to first consider and rule on error. Not only do the parties have the opportunity to develop and refine their arguments, but we have the benefit of other judicial review to focus and further analyze the questions at issue.

*In re B.L.D. and B.R.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (internal citations omitted). In holding that error preservation rules comport with due process, the Supreme Court explained, "Because the Legislature and this Court have provided heightened procedural protections in termination cases, we believe there is a low risk that consistently applying our preservation rules will result in erroneous deprivation."

We have undertaken a careful and deliberate review of the record. We have detailed with specificity the facts of the case. Even were we able to review OL's sufficiency complaints, we would nevertheless conclude that the Department met its onerous burden of establishing the statutory predicates for termination as well as the requisite finding of best interest. Having overruled all issues for review, we affirm the judgment of the trial court.

November 12, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
(Rivera, J., not participating)